IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2009

## ADAM WESTER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Anderson County**
**No. A7CR0222     Donald R. Elledge, Judge**

_____

**No. E2009-00245-CCA-R3-PC - Filed July 23, 2010**

_____

The Petitioner, Adam Wester, appeals the Anderson County Criminal Court's denial of post-conviction relief from his conviction for felony murder in the perpetration of aggravated child abuse, for which he received life imprisonment. The Defendant contends that trial counsel was ineffective in failing to suppress the Petitioner's written statements to law enforcement and in failing to challenge the State's expert regarding the cause of the victim's injuries. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Mart S. Cizek, Clinton, Tennessee, for the appellant, Adam Wester.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; David C. Clark, District Attorney General; and Sandra N. C. Donaghy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner's six-month-old son died from injuries the jury found were inflicted by the Petitioner. See State v. Adam F. Wester, No. E2004-02429-CCA-R3-CD, Anderson County (Tenn. Crim. App. Feb. 9, 2006). This court summarized the underlying facts of this case in the Petitioner's direct appeal:

> Amy Russell, the appellant's ex-wife, testified that she . . . worked about sixty hours per week as a licensed practical nurse

and as a cashier at K-Mart. While Russell was working, her mother or the appellant took care of the victim.

On December 16, 2001, Russell was at home with the victim and bathed and fed him. That afternoon, Russell's parents arrived to take the victim to have his picture made with Santa Claus. Russell's mother brought an outfit for the victim to wear, and Russell and her mother dressed the victim in the outfit. Russell's parents left with the victim about 3:00 p.m. Sometime later, the appellant arrived home, and Russell went to work, leaving [her older children,] Aaron and Alyssa[,] at home with the appellant. Russell returned home from work about 10:00 p.m. and found all of the lights turned on and Aaron and Alyssa asleep. The appellant and the victim were gone, and the victim's car seat was on the floor in the living room. The victim's clothes were on the floor in his bedroom, and a dark stain was on the mattress in his crib. About five minutes after Russell returned home, the appellant telephoned and told Russell that he had taken the victim to the emergency room. . . . Russell went to the Methodist Medical Center in Oak Ridge and learned that the victim had died. She said that she never hit the victim or threw him down, that his last physical examination was in October 2001, and that the victim was a normal, healthy baby. She said that there were no bruises on the victim when she bathed him earlier that day. Russell admitted that she pled nolo contendere to failure to report child abuse.

Alyssa Russell, who was five years old at the time of trial, testified that . . . sometime on the day of the victim's death, the victim was in his crib and started to cry. The appellant came into the room and told Alyssa to go to sleep. The victim was lying on his stomach, and Alyssa saw the appellant hit the victim on the victim's back, causing the victim to bounce up and down.

. . .

Michael Berthiaume, a physician's assistant, testified that he was working at Methodist Medical Center on the night of December 16, 2001. The appellant came into the hospital carrying the victim and said, "Please help me." The victim was

not breathing, and Berthiaume started cardiopulmonary resuscitation (CPR), using two fingers to compress the victim's chest. The victim was wearing only a diaper, was wrapped in a blanket, and was cold. On cross-examination, Berthiaume testified that CPR could crush a child's chest, damage internal organs, or break ribs. He stated that the victim had "blotchy spots" on his chest and that the appellant sounded distraught.

Dr. Barry Cummings testified that on December 16, 2001, he was working at Methodist Medical Center. Michael Berthiaume yelled that he needed help, and Dr. Cummings went into the treatment room. The victim was lifeless and was not breathing. He stated that the victim was cold, which could have resulted from the victim's having been dead for a period of time or could have resulted from the victim's having been exposed to a cold environment. Dr. Cummings put an airway tube into the victim's lungs, and nurses used a bag and mask apparatus to get oxygen into the victim. A cardiac monitor revealed that the victim had a very slow, irregular heart rhythm but no pulse. Dr. Cummings tried to resuscitate the victim for about one hour. At some point, the victim had a slight return of cardiac activity, but the activity was lost. He stated that the victim had bruises across his chest and abdomen, a bruise under his chin, a few bruises on his back, and redness on one of his buttocks. He stated that he talked to the appellant and that the appellant told him the following: The appellant put the victim to bed about 6:00 p.m. and propped up a bottle in the crib with the victim. About 10:00 p.m., the appellant checked on the victim and discovered that the victim was not moving. The appellant tried to wake the victim, got no response, attempted CPR, and took the victim to the emergency room.

On cross-examination, Dr. Cummings testified that the appellant was upset and pacing. He said that if CPR was done incorrectly, it could cause broken ribs; a bruised heart; or a tear in the mesentery, the blood vessels that supply blood to the intestines. He stated that in order to do CPR on a baby properly, one or two fingers should be used to depress the chest and that the compressions should have a depth of one-half to one inch. He said that too much pressure could fracture the sternum and

that a fractured sternum could injure the upper part of the abdomen. Dr. Cummings stated that some of the victim's bruises looked fresh and that some looked about twenty-four- to forty-eight-hours old.

Wanda Russell, Amy Russell's mother and the victim's grandmother, testified that on the afternoon of December 16, 2001, she and her husband took the victim to have his picture made with Santa Claus. They returned to Amy Russell's home about 5:30 p.m. . . . On cross-examination, Mrs. Russell testified that before she took the victim to have his picture made, she helped Amy change the victim's shirt and there were no bruises on the victim at that time. She said that on the afternoon of December 16, she noticed that a vein in the victim's neck was throbbing. She said that she did not remember telling a police officer that the victim had shallow breathing. She stated that the victim did not fuss or cry that afternoon.

Don Russell, Wanda Russell's husband, testified that on December 16, 2001, he and his wife took the victim to the mall in order to have the victim's picture made with Santa Claus. He stated that he never hit or threw the victim. On cross-examination, Russell testified that on the way to the mall, the victim appeared to have a breathing disorder. He stopped the car, but the victim seemed to be all right. Russell stated that before he and his wife took the victim to the mall, he held the victim while his wife and Amy Russell changed the victim's clothes. He did not see any bruises on the victim.

. . .

Sergeant Scott Ball of the Oak Ridge Police Department testified that he was the Deputy Coroner for Anderson County. . . . On December 16, the Medical Examiner for Anderson County requested that Sergeant Ball go to the Methodist Medical Center. Sergeant Ball viewed the victim's body and saw three, crescent-shaped marks on the victim's head. Sergeant Ball then went to the victim's home.

-4-

Detective Ron Boucher of the Oak Ridge Police Department investigated the victim's death. On the night of December 16, Detective Boucher was paged and advised that a six-month-old child had died at the Methodist Medical Center emergency room. Detective Boucher went to the hospital, talked to Dr. Cummings, and viewed the victim, who was wearing only a diaper. Detective Boucher then went to the victim's home and inspected the victim's bedroom. Several days later, Detective Boucher and Sergeant Ball transported the victim's body to the medical examiner's office in Nashville and attended the victim's autopsy. On December 19, Detective Boucher interviewed the appellant and Amy Russell separately, and both gave a written statement. According to the appellant's written statement, the appellant gave the victim a bottle about 6:00 p.m. and then went to watch television. Aaron and Alyssa were watching television in another bedroom. About 9:30 p.m., the appellant checked on the victim and noticed that he was lying on his back and looked pale. The appellant picked up the victim and discovered that he was not breathing. The appellant put the victim on Alyssa's bed and began breathing into his mouth. The appellant "started pushing him hard on his stomach and sides and chest because I heard something in his throat." The appellant took the victim to the hospital. Detective Boucher stated that the appellant also gave an oral statement in which the appellant said that he checked on the victim, noticed that the victim was not breathing, and then picked up the victim.

Detective Boucher testified that after the appellant gave his written statement, he interviewed the [Petitioner] again and told the appellant that the victim had bruises, broken ribs, and a broken collarbone. The appellant gave another written statement. In the statement, the appellant said that about one month before the victim's death, he was carrying the victim to his room and slipped and fell. The victim "hit his face and some of my weight landed on him." The appellant also said that after Wanda Russell brought the victim home on December 16, the appellant was playing with the victim and "was throwing him up and down in front of his bed." The victim "hit my arm sideways and he hit the side of the bed and bounced into the bed." The appellant checked the victim, believed the victim was all right,

and gave the victim a bottle. He then took Aaron and Alyssa to get something to eat and to the video store. About 9:30 p.m., the appellant checked on the victim. The victim was pale, and the appellant tried to give him CPR. The appellant rushed the victim to the hospital.

On cross-examination, Detective Boucher testified that he inspected the victim's room and examined the victim's crib but did not collect any evidence from the home. Wanda Russell told Detective Boucher that the victim had brittle bone disease and shallow breathing. Detective Boucher stated that the appellant told him that the appellant used his knuckles to give the victim CPR and that the appellant pressed on the victim's chest, stomach, and sides. He stated that the appellant was not a suspect on December 19, that he allowed the appellant to leave the police department after giving his statements, and that the appellant was not charged with a crime until June 2002.

The State recalled Amy Russell to testify. She stated that after she and the appellant left the police department on December 19, her mother drove them home. In the car, the appellant told Amy that he lied to the officers about throwing the victim into the air. According to the appellant, he told the story because the officers said they would harass Amy Russell and her children until he told the truth. . . .

Dr. Bruce Levy, the Chief Medical Examiner for the State of Tennessee, testified that he performed the victim's autopsy. The victim had bruises on his neck, chest, abdomen, and back, and most of the bruises occurred at the time of the victim's death or within several hours before his death. One bruise was yellowish and looked to be older than the others. Dr. Levy x-rayed the victim's body and found that the victim had a fractured collarbone that was in the process of healing but was misaligned. The victim also had multiple rib fractures, and six to eight of the fractures were in the process of healing. He said that some of the rib fractures occurred at or near the time of the victim's death and that some of the fractures were several weeks old. Dr. Levy collected six hundred twenty-five milliliters of blood from the victim's abdomen and found a tear in the

victim's abdominal mesentery. He explained that the mesentery is a fan-shaped piece of fat and tissue that connects the intestinal tract to the bloodstream. He said that the tear in the mesentery was three-eighths of an inch long and was beneath the victim's bellybutton. He said that one of the victim's rib fractures could not have caused the tear and that the tear resulted from a blow or crushing injury to the front of the victim's abdomen. He stated that a considerable amount of force had to be used to cause the injury and that the tear was not the type of injury that would result from the normal handling of a child. He stated that he had never known CPR to cause such an injury.

Dr. Levy testified that he saw no indication that the victim suffered from brittle bone disease. He said that the victim suffered from battered child syndrome and that the victim's cause of death was blunt force injuries to the torso. He stated that the victim's rib fractures would have been painful and would have prevented the victim from rolling over. He stated that the bleeding caused by the mesentery tear would not have been rapid and acknowledged that the tear could have occurred as early as 7:00 p.m. On cross-examination, Dr. Levy testified that the victim's bruises occurred three to four hours before his death, and he acknowledged that some of the victim's rib fractures could have occurred two months before his death. He said that CPR could result in torn livers and rib fractures and that only fingers should be used to perform CPR on a small child, not knuckles. He stated that all of the victim's rib fractures were posterior and on either side of the victim's backbone and that CPR had never caused such posterior rib fractures. He said that some of the victim's rib fractures were fresh and occurred within six hours of the victim's death. On redirect examination, Dr. Levy testified that the appellant's hitting the victim on the back, causing the victim to bounce up and down, would be consistent with the victim's broken ribs and the bruising on the victim's back.

At Dr. Levy's request, Dr. Hugh Berryman, a biological anthropologist, examined the victim's ribs and right collarbone. Dr. Berryman stated that he found thirteen rib fractures that

were at least two weeks old and eight fractures that occurred near the time of the victim's death.

Id., slip op. at 1-6.

At the post-conviction hearing, trial counsel testified that he had served as an assistant public defendant for four years before being elected the Public Defender for the Seventh Judicial District in 1989. He had been licensed to practice law in Tennessee since 1977. He had represented defendants in twelve to fifteen murder cases, although this was his first felony murder by aggravated child abuse case. He had tried other aggravated child abuse cases.

Trial counsel testified that the Petitioner was indicted in 2002 and that he was the primary counsel assigned to the case. The Petitioner gave two statements to police, one immediately after the victim died, and one later, which counsel reviewed. In the first statement, the Petitioner stated that he could not wake the victim and that the victim was not breathing. The Petitioner stated that he thought the victim might be choking and attempted mouth-to-mouth resuscitation, that he pushed on the victim's stomach and sides, and that he took the victim to the hospital. In the second statement, the Petitioner stated that at about a month before the victim died, he had been holding the victim and had fallen on the infant. The Petitioner stated that he had also been playing with the victim, tossing him into the air, and had not caught him well one time. Trial counsel stated that he was concerned about the statements' lack of thoroughness because details were missing.

Trial counsel testified that he and the Petitioner discussed the pros and cons of the Petitioner's testifying. They decided that the statements were the best way to provide the Petitioner's version of events to the jury. He said that the Petitioner maintained that he had injured the victim during the administration of CPR and that the defense theory was CPR "gone wrong." He said that the statements were not incriminating because the Petitioner did not admit to child abuse. The statements provided a reasonable explanation of how the injuries occurred. They decided early in counsel's representation of the Petitioner that counsel would not file a motion to suppress the statements. He said that the statements would have stood in place of the Petitioner's testimony.

Trial counsel testified that he did not believe that the outcome of a suppression hearing would have been determinative of whether the Petitioner testified. Even if the statements had been suppressed because of a Miranda violation and the Petitioner had chosen to testify, the State might have been able to use the statements to impeach the Petitioner's testimony. He said that because the Petitioner left the police station after making both statements, he was not sure that he would have succeeded on the motion to suppress. He

agreed that if the statements had been suppressed, he could have "opened the door" to have brought them in, but he said that he would not have taken that chance. He acknowledged that the Petitioner would not have been adversely affected by his filing a motion to suppress. When asked whether he could have put himself in "exactly the same position" had the trial court suppressed the statements, he said that he could have changed his position later but that he was not sure why he would do so. He said that there was no reason to suppress the statements "because the accidental death caused by the mis-administration of [CPR] in a good-faith effort was the defense we had all along."

Trial counsel testified that the victim's cause of death was determined to have been pressure on the mesentery, which caused it to tear and resulted in internal bleeding. Counsel hired Dr. Randy Pedigo, a former Knox County medical examiner, as an ex parte expert to assist him. He said that Dr. Pedigo was available to testify but would not have made the best witness because Dr. Pedigo had "some personal problems." Counsel and Dr. Pedigo traveled to Nashville and interviewed Dr. Bruce Levy, who had performed the autopsy on the victim. Dr. Pedigo was retained in part to help trial counsel find an expert who would have testified to a reasonable degree of medical certainty that the victim's injuries could have been caused by incorrectly performed CPR. However, Dr. Pedigo was unable to find an expert to contradict Dr. Levy's testimony. Dr. Pedigo sat behind trial counsel and advised him during the trial.

Trial counsel testified that Dr. Barry Cummings was the emergency room physician who treated the victim. He said that Dr. Cummings testified that putting too much pressure on the victim's chest while attempting to perform CPR could have been sufficient to tear the mesentery and to cause the bleeding that led to the victim's death. However, Dr. Cummings was unwilling to state an opinion to a reasonable degree of medical certainty that this was what occurred. He said that Dr. Levy, on the other hand, testified to his opinion to a reasonable degree of medical certainty that CPR performed incorrectly would not have torn the victim's mesentery. Both witnesses were accepted as experts at the trial. Counsel said that he was aware of the nature of Dr. Levy's testimony before the trial and that if the State had not called Dr. Cummings to testify, he would have called Dr. Cummings to testify for the defense. He said, however, that he was able to elicit cross-examination testimony from Dr. Cummings that was favorable to the Petitioner.

On cross-examination, trial counsel testified that he had defended three to five aggravated child abuse cases. When asked how he had learned the medical terminology that he used during the trial and why he had used a certain treatise, he attributed his knowledge to Dr. Pedigo's help. He said that he and the Petitioner discussed whether the Petitioner would testify "at least a half a dozen times." He said that the Petitioner was evaluated by Ridgeview Psychiatric Center to determine whether the Petitioner had "awareness enough

-9-

to turn down the plea offer we'd been given." He agreed with the Petitioner that other than a "human presence," the Petitioner's testimony would not have added anything to the information contained in the Petitioner's statements. He was concerned in part about the Petitioner's testifying because the Petitioner had a prior criminal record.

Trial counsel testified that he would not have chosen a different expert than Dr. Pedigo to assist him because Dr. Pedigo knew Dr. Levy and because Dr. Pedigo had the necessary education and contacts. He said that if there had been an objective, scientific way to show that Dr. Levy was wrong, he would have needed an expert to testify to that. However, the medical literature did not give a definitive answer about whether incorrectly performed CPR could cause a tear of the mesentery.

The Petitioner testified that trial counsel represented him at the trial and on appeal. He said that he met with Dr. Pedigo but knew that Dr. Pedigo could not testify because of Dr. Pedigo's past. He said that his mother-in-law informed trial counsel that the victim had shallow breathing and brittle bone disease and that she testified to it at the trial.

The Petitioner testified that he made the two statements to police on the same day. He said that Detective Boucher told him that it was mandatory that he give a statement because his child had died. He said that the police interviewed his wife for about two hours before they interviewed him. He said that police officers took him to a small room, that they seated him with his back to the wall, and that two officers stood in front of the door. He said that Detective Boucher asked him how he had killed his son and that he replied that he did not kill his son. He said Detective Boucher insisted that he had killed the victim and demanded that he write a statement. He wrote a statement, but Detective Boucher told him that what he had written was not true and demanded that he write a second statement. He wrote a second statement that was not "completely correct." He said that he felt as if he had to write what he did in the second statement before the police would allow him to leave. He was not advised of his Miranda rights, although he said that he was familiar with them. He believed that if he tried to leave, the officers would have "jumped" him.

On cross-examination, the Petitioner testified that he told trial counsel that he felt intimidated and pressured by Detective Boucher. He said that Detective Boucher testified at the trial and that he wanted counsel to ask Detective Boucher why the Petitioner had to give a second statement if he had given the first statement by choice. He said that he did not understand that counsel could not ask such a question if counsel wanted the statements to be admitted into evidence. He acknowledged that he wrote the statements and that no one forced him. He did not agree that the statements he gave to the police were helpful to his case. He agreed that when he gave the statements, he was not under arrest and was allowed

-10-

to leave. He said that he made a third statement but that the police were dissatisfied with it and destroyed it.

The Petitioner testified that he and trial counsel discussed several times whether he would testify, and he agreed that it was his decision not to testify. He acknowledged that the facts of the victim's alleged shallow breathing and brittle bone disease were fully explored at the trial. At the time of the trial, he did not know of an expert that trial counsel could have called to testify about brittle bone disease, but he had since researched some doctors on the Internet. He said that one doctor used to live in New York but was no longer there. The doctor in New York never examined the victim. He agreed that he had asserted that trial counsel should have called the victim's doctor to testify about the number of times the doctor had examined the victim and whether the doctor had observed any injuries. He said that he could not remember the doctor's name. He agreed that his wife had testified that the victim's "well-baby" examinations were conducted by the Health Department. He acknowledged that he did not know if the victim was ever seen by a doctor for a check-up. He agreed that he was present at the trial when Dr. Cummings was questioned about sudden infant death syndrome, mesentery injuries, CPR, fractures to the victim's legs, bruising, shallow breathing, and blunt force trauma. He agreed that trial counsel strongly cross-examined the State's witnesses. He recalled that counsel cross-examined the coroner about bone disorders. He said that counsel developed the theory of improper CPR but that he did not realize that incorrectly performing CPR on the victim could cause the victim's death. He said that he was just trying to save his son. He agreed that Dr. Cummings's testimony was helpful to his defense.

The trial court accredited trial counsel's testimony. The trial court found that the decision to allow the Petitioner's statements into evidence was a tactical one. The court also found that counsel had made a significant effort to find an expert to testify that CPR could have caused the victim's injuries. The trial court determined that the Petitioner received the effective assistance of counsel.

**I**

The Petitioner contends that he received the ineffective assistance of counsel because (1) trial counsel failed to seek to suppress his statements to the police and (2) trial counsel did not develop expert medical proof to challenge Dr. Levy's testimony regarding the likely cause of the injuries leading to the victim's death. The State contends that the trial court correctly concluded that the petitioner received the effective assistance of counsel. We agree with the State.

The burden in a post-conviction proceeding is on the Petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). Once a petitioner establishes the fact of counsel's errors, the trial court must determine whether those errors resulted in the ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04, (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they

are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

The trial court determined that the Petitioner failed to show his allegations of the fact of counsel's errors by clear and convincing evidence. The evidence does not preponderate against the trial court's factual findings. The trial court accredited trial counsel's testimony. The decision not to attempt to suppress the Petitioner's statements was a tactical decision made after consultation with the Petitioner. The Petitioner's statements supported the defense's theory of incorrectly performed CPR in lieu of the Petitioner's testimony. Trial counsel also was unable to find an expert witness to testify in direct contradiction to the medical examiner's testimony, but counsel was able to elicit testimony favorable to the Defendant from another expert, Dr. Cummings. Dr. Cummings believed that incorrectly performed CPR could cause a tear to the mesentery, but he was unable to state his opinion in this case to a reasonable degree of medical certainty. Counsel testified that he would have called Dr. Cummings to testify for the defense if he had been unable to elicit favorable testimony on cross-examination.

The Petitioner has failed to show how counsel's performance fell below an objective standard of reasonable representation and how he was prejudiced. We hold that the trial court did not err when it determined that the Petitioner received the effective assistance of counsel. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE